STATE of Missouri ex rel. Antoine SCHOEN-
BACHER and Karl Ederer, Relators,

v.

Honorable John J. KELLY, Jr., Judge of Di-
vision No. 7, Circuit Court, St. Louis
County, Respondent.

No. 32283.

St. Louis Court of Appeals, Missouri.

Oct. 18, 1966.

Motion for Rehearing or to Transfer to
Supreme Court Denied
Nov. 15, 1966.

**384**

Victor Packman, Abraham Davis, Harvey I. Feldman, St. Louis, for relators.

Husch, Eppenberger, Donohue, Elson & Cornfeld, James W. Singer III, St. Louis, for respondent.

TOWNSEND, Commissioner.

Original proceeding in prohibition.

The procedural history discloses the following sequence of events leading up to the application for the writ:

On May 4, 1965, Hans Coiffures International, Inc. filed its petition in the Circuit Court of St. Louis County, seeking an injunction against Schoenbacher and Ederer (relators herein) to prevent them from violating the terms of separate alleged employment contracts and in a second count to enjoin them from pursuing an alleged scheme and conspiracy to deprive plaintiff of its business, customers, trade secrets, good will, and trade name. In each count plaintiff prayed for a restraining order until such time as its prayer for temporary injunction could be heard. On the same day the respondent judge entered his order to show cause, returnable May 13, 1965, why a temporary injunction should not be granted, and in the same order restrained the defendants from pursuing certain occupations in the City or County of St. Louis until the further orders of the Court. The order recited that defendants had not been notified of the application for injunction; bond in the amount specified by the Court, $2000, was furnished. On the following day the defendants were served with the order.

Two days thereafter defendants filed their separate motions to dismiss the restraining order, which on May 8 were overruled; the restraining order was modified as to defendant Ederer. On May 11, 1965, plaintiff filed its petition for contempt, supplemented by affidavits of two persons reciting violations of the restraining order by defendants. Contempt citation was issued the same day, returnable May 13, 1965; returns to the citation were made on that day. Respondent ordered plaintiff to furnish an additional bond of $2000 by June 1, 1965.

On May 13, 1965, plaintiff announced ready to proceed with the hearing for a temporary injunction but defendants requested a continuance which was granted. On the same day respondent entered the following order:

"On oral motion of defendants order to show cause continued to 9:30 a. m., Monday, June 1, 1965; Return to Order to Show Cause to be filed prior to June 1, 1965, and cause to be tried on the merits on said date. Cause advanced to the top of the trial docket of 1 June, 1965, and peremptorily set that date."

Plaintiff filed a motion on May 24, 1965, to hold defendants in contempt for failure to appear to have their depositions taken.

Petition for Writ of Prohibition was filed in this Court on May 27, 1965, and the preliminary writ issued on June 25, 1965.

The petition in the suit for injunction sets forth that plaintiff is engaged in the business of operating and conducting a beauty salon and in the business of making wigs and toupees in St. Louis County under the trade name of "The Duke & Duchess Wigs and Toupees". It alleges the existence of individual employment contracts, each for a period of four years, with each of the defendants, Ederer as a hair stylist and Schoenbacher as a hair stylist, barber and wig and toupee maker. Each contract provided that upon the termination for any cause of the relative employment defendant would not engage in the same or similar line of business as conducted by plaintiff or work for any individual, firm or corporation engaged in such business within the City or County of St. Louis. It is further alleged that after voluntarily terminating their employment with plaintiff defendants commenced working for themselves as wig makers in St. Louis County under the name of "Lord and Lady, Ltd., Wig Masters". In the second count plaintiff charges that defendants voluntarily terminated their employment pursuant to a scheme and conspiracy wrongfully, fraudulently and illegally to deprive plaintiff of its business, customers, trade secrets, good will, trade name, and employees, and to acquire all of the same for themselves by doing business

in St. Louis County as wig makers. This count also charges that the defendants are using trade secrets and information imparted to them by plaintiff in carrying on plaintiff's business, by using customer lists illegally taken from plaintiff in order to acquire plaintiff's customers, or attempting to persuade plaintiff's employees to cease working for plaintiff, and are using the trade name of "Lord and Lady, Ltd., Wig Masters" deceitfully to cause the public to believe that when doing business with them the public is actually doing business with plaintiff. Copy of the contract with defendant Schoenbacher recites that it is an agreement between him and Duke & Duchess Wigs and Toupees, Inc., a Missouri corporation. Each such contract contains a provision for liquidated damages of $50.00 per day in case of breach by an employee and in addition provides that the employer shall at its option have the additional right of applying for an injunction in restraint of any such violation. There is a variation between the two contracts as to the compensation of the respective employees and as to other contractual details.

Relators' attack upon respondent's jurisdiction—or lack thereof,—may be adequately summarized under three heads:

(1) That the restraining order, issued without prior notice, amounted to a denial of due process, was violative of constitutional safeguards and hence was invalid;

(2) That the restrictive covenants of the employment contracts are made unlawful and void by Section 416.040, V.A.M.S.;

(3) That the petition, upon the basis of which the restraining order was issued, did not disclose a situation where, according to the usages of equity, the plaintiff was entitled to relief.

Additionally, as a contention personal to defendant Schoenbacher, it is maintained that the suit against that defendant had no contractual basis since, it is asserted, the petition shows that plaintiff was not a party to Schoenbacher's employment contract.

Clearly, if there was no contract between plaintiff and Schoenbacher, respondent had no jurisdiction over the subject-matter of Schoenbacher under Count I. Consideration is given first to the contention thus made.

### RELATOR SCHOENBACHER

Under Count I of the petition for an injunction it is alleged that the plaintiff operates its business under the trade name of "The Duke & Duchess Wigs and Toupees" and that it entered into the alleged contract of employment with Schoenbacher on or about July 22, 1964, which contract is attached to the petition as Exhibit B. The parties to Exhibit B are described as Duke & Duchess Wigs and Toupees, Inc. and Antoine Schoenbacher. Exhibit B is signed "Duke & Duchess Wigs and Toupees, Inc., by Hans Wiemann", and by Schoenbacher. The petition for injunction states further that Schoenbacher worked for plaintiff as a wig maker until on or about April 28, 1965. The question then plainly is whether or not plaintiff has a contract with Schoenbacher which can be the basis of the suit under Count I.

The petition of plaintiff declares that Exhibit B is a contract between itself and the named defendant. We are then presented with the question of whether the obviously faulty draftsmanship of Exhibit B precludes the plaintiff from showing that the contract was made with itself under a name assumed by the plaintiff for the purposes of dealing with Schoenbacher. Since the petition shows that the plaintiff was carrying on business under the name of Duke & Duchess Wigs and Toupees, and since the petition alleges that Exhibit B is a contract between itself and Schoenbacher, we think it is open to Hans Coiffures International, Inc. to show that for the purpose of entering into contractual relations with Schoenbacher it adopted the name of Duke & Duchess Wigs and Toupees, Inc. This conclusion is fortified by the fact that under the contract found in Exhibit B defend-

ant Schoenbacher worked for Hans Coiffures International, Inc. for several months before quitting the latter's employment. Additionally, the contract found in Exhibit B designates the employer's beauty salon, 1012–1016 South Brentwood Boulevard, St. Louis County, as the place where Schoenbacher's services were to be rendered; that location is otherwise identified as plaintiff's place of business. "* * * a person may adopt or assume a different name from his true one, and may even carry on business and make contracts under his fictitious name * * *". Sims v. Missouri State Life Ins. Co., 223 Mo.App. 1150, 23 S.W.2d 1075, 1078. It is well established that a person can bind himself in contract by another than his true name. "The intent controls" (Guess v. Russell Bros. Clothing Co., Mo.App., 231 S.W. 1015, 1016) whether the person in question is plaintiff, De Maria & Janssen v. Baum, 227 Mo.App. 212, 52 S.W.2d 418, or is defendant, Guess supra. Where that person is plaintiff, his failure to comply with the requirements of the Fictitious Name statute does not result in a condemnation of outlawry. Ditzell v. Shoecraft, 219 Mo.App. 436, 274 S.W. 880.

▮ While it would be anomalous to find that one corporation had assumed the name of a non-existent corporation for a particular contractual purpose it does not pass the limits of credibility where mistake in drafting is written large across the face of the whole matter.

It is to be noted that under the objection to jurisdiction thus taken by relators nothing is said in the petition for prohibition and the suggestions relating thereto, denying the possibility of jurisdiction over Schoenbacher under Count II of the petition for injunction.

### DUE PROCESS

Although relators' brief under Points and Authorities intermingles several variant types of complaint under a single head, analysis of their argument as a whole necessitates the statement of their objections in the manner previously stated.

Relators present here the constitutional contention that respondent's issuance of the restraining order was not in accord with due process.

It is much too late in the day to maintain that the issuance of a restraining order without notice violates per se the requirement of due process. The historical evidence is to the contrary. Long before the time of the adoption of the Fourteenth Amendment it was an established practice of chancery to grant a temporary injunction or a restraint in the nature of an injunction without notice. We are informed by Kerr on Injunctions (Boston, 1871, reprint of earlier English edition):

"Instead of issuing the writ of injunction in the first instance the court will often grant an interim order in the nature of an injunction, by which the defendant is restrained until after a particular day named, liberty being given to the plaintiff to serve notice of motion for an injunction for the day before such day. The usual practice is to extend the order over the whole of the next motion day, in order that the plaintiff may serve, by leave of the court, the defendant with notice of motion for an injunction for that day. * * * In many respects there is a convenience in proceeding by interim order instead of granting an injunction. * * * Interim orders are generally granted upon *ex parte* application, * * *. Where the application is *ex parte* it is necessary that the court should be informed of all material facts. The court does not, perhaps, upon an application for an interim order, require the same special mention of all particulars which it requires where the application is for an *ex parte* injunction, but it is the duty of the party who makes the application to bring all material facts before the notice of the court." (Pages 620, 621.)

And it is stated in Hilliard, The Law of Injunctions (Philadelphia, 1865):

"§ 113. It is said, although the practice in this country [U.S.] is to grant an injunction, on the filing of the bill, *without notice to the defendant*, yet the complainant must use due diligence in prosecuting his suit afterwards, or the bill will be dismissed." (P. 49–50.) (Emphasis ours.)

The treatises, older and newer, discuss at many points the practice of issuing an injunction without notice to the defendant, verifying and restating the ancient custom of the chancellors. E. g., see High on Receivers (4th ed.) §§ 3, 6. The antiquity of the practice is illustrated by the cases set out in the footnote.[1]

That various cases express conditions upon which the particular chancellor chose *to act in a particular case in no way* detracts from the fact that the practice was established and that the propriety of the court's action did not depend upon notice to the defendant. Where the chancellor expressed a condition upon which he would grant or deny an injunction he was simply exercising his discretion, dependent upon his weighing of the equities in the case.

All this was strictly in accord with the well known principle that equity acts at discretion, individualizing each particular case, in determining whether or not equity should intervene in the situation. The statement of the condition could not result in an ossification of "equity law". It still left the operations of the chancellors within the referential framework of "Equity acts at discretion." All this had no relation to the question of whether the procedure had been correct and hence could have had no impact on any problem of due process.

■ The issuance of a mere restraining order does not violate the constitutional principle that a defendant may not be condemned without a hearing. The temporary restraint imposed does not purport to pass upon the merits of a controversy, is dispositive of no issue and hence does *not amount to a condemnation as that* term is used in the statement of the principle. The sole purpose of the restraining order is to preserve the status quo[2] until the hearing upon the order to show cause; in this respect we emphasize that the order here was only an ephemeral stage in setting the scene for a full hearing on the prayer for a temporary injunction.[3] The

1. Pearce v. Crutchfield, 14 Ves.J. 206— Nov. 30, 1807
 "An Order was made just before the Vacation, that Mrs. Farmer should attend in Court on this day; restraining her in the meantime from all communication with a young man, of the age of eighteen; upon affidavits of an intended marriage between them. [After fruitless attempts to serve defendant] Lord Eldon granted an Injunction."
 Dr. Martin and Lady Arabella Howard v. Nutkin et al., 2 Peere Wms. 266 (1724)
 "* * * on motion Lord Chancellor Macclesfield granted an injunction to stay the ringing [of a church bell] *until hearing*." [The cause came on for hearing before the Lords Commissioners Gilbert and Raymond "who decreed that the injunction should continue during the lives of the plaintiffs and the survivor of them".]

2. In this context, preserving the status quo is taken to mean not merely freezing the situation as the court now finds it

but to mean figuratively the restoration of the parties to "the last actual, peaceable, non-contested condition which preceded the pending controversy." High on Injunctions, 4th ed., § 5a. Sometimes the preservation of the status quo involves an order in the nature of a mandatory injunction, a feature not present in the instant case.

3. It is not necessary here to wander through the forest of injunctive nomenclature—preliminary injunction, restraining order, temporary injunction, interim order, interlocutory injunction. No matter what the label, conduct of the addressee is restrained. As between restraining order and temporary injunction the affixing of one label or the other usually has significance only in determining the moment of its dissolution. See Perservance Common School District No. 90 v. Honey, Mo. App., 367 S.W.2d 243, where it is said: "* * * a 'temporary restraining order' is an injunction." (Page 247).

order to show cause was made returnable on the ninth day after the date of the restraining order, the necessary effect of which was to prohibit relators from pursuing the stated occupations. Relators were protected by the bond invariably required in such situations. The amount of the bond was later doubled. In all this we detect no lack of due process [4].

Where a statute conditions the issuance of an injunction upon notice to the defendant, as has been the case in some states, then necessarily local practice must conform to the terms of the statute. Cases holding that the issuance of an injunction was improper where such a statutory requirement was not satisfied are in no way relevant to the question of constitutional due process. In this connection it is to be noted that the Missouri procedural statutes do not require that notice shall be given to defendant before issuing a temporary injunction. Sec. 526.050 [5], V.A.M.S., except where the injunction is one to stay some proceeding. Section 526.100.[6] Section 526.-140 relates to proceedings where "no notice of such application is required by this chapter" and provides that if "the court * * * shall deem it proper that the defendant * * * should be heard before granting the injunction", the court may require cause to be shown at a specified time and "may, in the meantime, restrain the defendant, or make such other order as the case may require." Respondent's action followed the terms of this section in that he deemed it "proper" that defendant should be heard before granting the injunction and so ordered; at the same time he exercised the authority given by the same section to restrain the defendants "in the meantime".[7] But relators contend that no statute can delimit the need for notice and an opportunity to be heard if constitutional safeguards regarding due process are respected. This contention is sufficiently considered by what has been heretofore said about the ancient practices in equity. We deem Section 526.140 and respondent's conduct thereunder to be in accord with historically established concepts of fair and reasonable proceedings and hence of due process.

## APPLICABILITY OF SECTION 416.040, V.A.M.S.

Do the contracts, made a part of the petition, show on their face that they are void by reason of Section 416.040 V.A.M.S.?

4. We are cited to Hovey v. Elliott, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215. However in that case a defendant's answer was stricken, his previously entered evidence was suppressed and decree against him was entered *pro confesso*— all because defendant was in contempt for failure to obey an interim order of the court. Held: "We rest our decision on the want of power in the courts of the District of Columbia" to render a decree pro confesso under such circumstances and such decree is not entitled to full faith and credit as against third parties. The relevance of this authority escapes us.

5. The corresponding Supreme Court rule is 92.02, V.A.M.R. and authorizes a restraining order as well as a temporary injunction.

6. The related Supreme Court rules are 92.03–92.07.

7. "The assignment that the temporary restraining order was issued without notice cannot be sustained. Respondents' jurisdiction, in the sense of power to act, was not conditioned upon a showing of previous notice to relator Baumes." State ex rel. and to Use of Baumes et al. v. Mason, 348 Mo. 436, 154 S.W.2d 67, 72.

"* * * equity has never prescribed it [notice] as a condition precedent in all cases to the grant of a temporary injunction. * * * The jurisdiction of the circuit court of the case made by the petition was not dependent upon the fact of previous notice to the defendant of the motion for temporary injunction." State ex rel. McMillan v. Woodside, 254 Mo. 580, 163 S.W. 845, 848. And see Ex parte Gounis, 304 Mo. 428, 263 S.W. 988, 991.

We set out here those portions of the section quoted by the relators:

> "All * * * contracts, agreements * * * or understandings made or entered into between two or more persons, designed or made with a view to lessen, or which tend to lessen, lawful trade, or full and free competition in the * * * manufacture or sale in this state of any product, commodity or article, or thing bought and sold, of any class or kind whatsoever * * * are hereby declared to be against public policy, unlawful and void; * * *."

Relators would have us believe that the applicability of the section is so clear that it determines conclusively the invalidity of the contracts and "leaves no need now for weighing provisions of such contracts on scales of equity." By a curt answer and by citing to us cases involving neither the interpretation nor the application of the section, respondent in effect ignores the issue.

■ A thorough examination of the annotations to this statute has revealed no case in which there was presented the question of the application of the section to a personal service contract simplex.[8] We do not believe that the language of the section is so clear and unambiguous as to give compelling evidence of legislative intent to bring contracts for purely personal services within the doom of the statute. The latter portion of the quoted section refers to "full and free competition in the * * * manufacture or sale in this state of any product, commodity or article" and admits of little doubt; however the earlier portion, "made * * * with a view to lessen, or which tend to lessen, lawful trade" embodies concepts of uncertain meaning when simple employment contracts are brought under surveillance. We attempt no interpretation. At the most we say that the applicability of the section is a matter of uncertainty and doubt. Relators cannot determine its applicability by their mere ipse dixit. In that posture we do not regard prohibition as an appropriate vehicle by which to impose on this Court the function of making an authoritative interpretation. We take the section as we find it—its meaning in doubt. Accordingly, relators have failed, on this point, to sustain the burden resting on them to show respondent's lack of jurisdiction. State ex rel. Schlueter Mfg. Co. v. Beck, 337 Mo. 839, 85 S.W.2d 1026, 1033; State ex rel. State Highway Commission v. Curtis, 365 Mo. 447, 283 S.W.2d 458, 463.

## USAGES OF EQUITY

(a) *Irreparable Damage.* Relators regard the pleading of the probability of irreparable damage or some other type of immediate necessity as a prerequisite to the issuance of a restraining order.

It may be noted at the outset that the operative statute imposes no such requirement. Section 526.030, V.A.M.S. provides that, "The remedy by writ of injunction * * * shall exist in all cases * * * to prevent the doing of any legal wrong whatever, whenever in the opinion of the court an adequate remedy cannot be afforded by an action for damages." Plainly this section places upon the availability of the remedy none of the conditions or qualifications previously existing in equity, save only the one relating to the inadequacy of the legal remedy. However it would be impossible to ignore the gloss long ago put upon the section by appellate courts, Neiser v. Thomas, 99 Mo. 224, 12 S.W. 725; Boeckler v. Missouri Pac. R. Co., 10 Mo.App. 448, and the subsequent adherence thereto. State ex rel. Kenamore v. Wood, 155 Mo. 425, 56

8. In Reddi-Wip, Inc. v. Lemay Valve Co., Mo.App., 354 S.W.2d 913, there is a suggestion of possible application of Section 416.040. In any event the contractual restraint there at issue related to the defendant's manufacture and sale of a definite product. In the language of the court, the action was "one to enjoin the breach of a contract restricting the manufacture of an unpatented article."

S.W. 474 [9]; State ex rel. Office, etc. v. Horner, 238 Mo.App. 787, 187 S.W.2d 976, 978 [10]. Accordingly we act upon the assumption that this statute did not enlarge the equity jurisdiction (Neiser v. Thomas, supra), i. e., did not remove the previously generally accepted conditions upon the exercise of the injunctive power.

█ We proceed to consider the necessity of pleading irreparable damage. In the petition for injunction the plaintiff alleged that the conduct of defendants would, if unrestrained, result in irreparable damage to it. It was once said by the Supreme Court that such an allegation (prophecy) is not in and of itself sufficient to invoke the interference of the court, State ex rel. Kenamore v. Wood, supra. However a showing of the probability of irreparable damage or of the need of immediate action to protect the lawful interests of the plaintiff—if such be requisite to action by the court—may well be had by pleading the facts which cause the plaintiff to take the initiative. While such recitals of facts may be traversed, yet in the nature of things they are taken as true upon an ex parte application for a restraining order; the court's opinion as to the need for immediate action must rest upon such allegations. Therefore under the Kenamore case the propriety of the temporary restraint must rest upon an assumption as to their truth. The court must first determine whether the allegations make out prima facie, good cause for the court's intervention. We think that the plaintiff in the petition for an injunction here did allege facts which taken as true, might well cause respondent to find that there was need for immediate action to protect the legal rights of plaintiff. We agree that the petition

presented "an extremely aggravated and indeed unconscionable situation." Therefore we find that not only did the plaintiff plead irreparable damage in a general way but plaintiff alleged such specific facts that any requirement of a showing of the probability of irreparable damage was satisfied.

█ (b) *Adequacy of Legal Remedy.* Each of the employment contracts contains a provision for liquidated damages and in addition purports to confer upon the employer the privilege of applying for an injunction to restrain the employee from a continuing breach of contract. Relators maintain that because of the provision for liquidated damages the petition shows that plaintiff had an adequate remedy at law and so plaintiff could not be entitled to injunctive relief. We cannot agree that the mere fixing of liquidated damages necessarily demonstrates conclusively the complete sufficiency of a resort to the legal remedy for redress of a legal wrong. Wills v. Forester, 140 Mo.App. 321, 124 S.W. 1090. The fact that a contract contains a provision for liquidated damages does not make the contract one for performance in the alternative, i. e.,—to give the relative party the election either to perform the principal objective of the contract or to make a monetary payment. Wills v. Forester, supra. The very use of the word "damages" in the liquidated damages clause indicates that a sanction will be imposed upon a defendant for a breach of his obligation. Stein v. Bruce, Mo.App., 366 S.W. 2d 732. A breach cannot be a performance. Unless the context clearly shows a different intention, such a clause cannot give him an election between alternative methods of full performance; on the contrary it specifies a method of chastening him for not

9. " * * * there must be some special circumstances bringing the case under some recognized head of equity jurisdiction before it will wield the powerful writ of an injunction." (at page 476)

10. But compare the language of the opinions in Summit City Creamery Co. v. Leach, Mo.App., 41 S.W.2d 191 and

Thompson v. City of Malden, Mo.App., 118 S.W.2d 1059. It was said in Gordon v. Mansfield, 84 Mo.App. 367, that "In order to invoke the remedy by injunction, it is not necessary under the statute * * * for a plaintiff to allege and prove that the legal wrong threatened is irreparable."

performing his promise. High on Injunctions, 4th ed., § 1175. In essence a valid provision for liquidated damages merely relieves the non-breaching party of the necessity of proving his actual damages, *if he chooses to sue for damages*, or otherwise assert his right to damages; *that is its function* and it has no relation to the broad question of whether or not a monetary recovery is a measure sufficient to relieve fully the complainant from the distress he suffers by reason of defendant's wrong.

 Plaintiff has pleaded generally lack of an adequate remedy at law. The allegations of specific facts found in the petition show, prima facie, that an action for damages would not afford the plaintiff an adequate remedy.

(c) *Illegal and Oppressive Contract*. The employment contracts are denominated oppressive and unreasonable by relators and therefore not a subject for equitable relief.

Relators' argument on this point is of course based on the fact that one of the promises of each relator is that, within the City and County of St. Louis, he would not engage, upon the termination of his employment, in a line of business the same or similar to that carried on by the plaintiff. Since the promise contains no stated limitation upon the period of the restriction of the employee's liberty of action, relators maintain that the absence of such a limitation renders the contract illegal and has "destroyed the enforceability of the contract."

This argument on the part of the relators necessitates the contention that, whenever a contract includes an engagement which restrains the promisor's freedom of action for an unlimited period of time, the restraint is of such a malignant character that it diffuses instantaneously throughout the contract and mortifies the whole. No Missouri authority which justifies such a sweeping conclusion has been cited to us.

Whatever was said in Mallinckrodt Chemical Works v. Nemnich, 83 Mo.App. 6 (affirmed 169 Mo. 388, 69 S.W. 355) regarding the effect of the absence of a time limitation in the restrictive covenant, was plain dictum as the covenant in that case contained a definite time limitation—five years. The same may be said of Reddi-Wip, Inc. v. Lemay. Valve Company, Mo.App., 354 S.W.2d 913, where the Court found that there was a definite time limitation contained in the restrictive covenant.

That feature which was held to make a restrictive covenant invalid in Prentice v. Rowe, Mo.App., 324 S.W.2d 457, and Prentice v. Williams, Mo.App., 324 S.W.2d 466, was not the absence of a time limitation but the fact that the restriction was wholly unlimited as to area. The covenant contained a time limitation of two years. In the present context, the most that can be said of the latter two cases is that the Court said that in order for a restraint to be reasonable it must "usually" be qualified as to time and area, a generalized type of statement found in many other cases. Obviously the Court did not have before it and did not purport to pass upon the question of the effect of an absence of time limitation alone. By italicization and by express words the Court emphasized that it based its holdings upon the absence of any limitation upon the *area* within which the restraint was to operate.

Accordingly, we have before us no Missouri ruling that a contractual restraint of the kind here in question was invalid because of the absence of a time limitation. In a wide ranging and intensive survey of such a question, the editors of A.L.R. have published a lengthy annotation from which they arrive at the conclusion:

"The overwhelming majority of the cases lend support to the rule that the mere fact, standing alone, that a restrictive covenant not to compete ancillary to a contract of employment contains no time limit or is expressly made unlimited as to time does not render the restriction

ipso facto unenforceable." 41 A.L.R.2d 41.

The cases elsewhere, collected and classified by the annotators, show that the effect of the absence of a time limitation depends in each case upon the reasonableness of the restriction, a matter to be considered hereinafter.

In a related area Missouri courts have held that the restrictive covenant is not made void or unenforceable by the lack of a time limitation. Gordon v. Mansfield, 84 Mo.App. 367; Kreger Glass Co. v. Kreger, Mo.App., 49 S.W.2d 260. While these were cases of the sale of a professional practice and of a business we find applied the criterion of the reasonableness of the restraint. It is stated in the Gordon case that "the test to be applied in determining whether the restraint is reasonable is whether it is such only as affords a fair protection to the interest of the party in favor of whom it is given and not so large as to interfere with the interest of the public." In accordance with that principle the Court in the Kreger Glass case limited the injunction to the period during which the plaintiff remained in business although the contract contained no time limitation.

In harmony with the approach taken in the Kreger Glass case we find that in employment contract cases some courts in the exercise of equity's discretionary power have limited the period of an injunction to such duration as is necessary to give an employer fair protection of his interest although the restrictive covenant contained no time limitation. Lewis v. Krueger, Hutchison and Overton Clinic, 153 Tex. 363, 269 S.W.2d 798. In the latter case the court said: "Merely because a limit has not been fixed for the duration of the restraint, the agreement will not be struck down but will be enforceable for such period of time as would appear to be reasonable under the circumstances." Similarly, where the court found that a fixed period of restraint was unreasonable, it enjoined the employee for such portion of that period

as it regarded as necessary to the protection of the employer. John Roane, Inc. v. Tweed, 33 Del.Ch. 4, 89 A.2d 548, 41 A.L.R. 2d 1. The approach of the respective courts in the last two cases cited has the approval of Corbin on Contracts, § 1394, where it is said: "As in the case of contracts restraining the seller of a business with its good will, the fact that the restriction on an employee goes too far to be valid as a whole does not prevent a Court from enforcing it in part insofar as it is reasonable and not oppressive. The injunction may be made operative only as to reasonable space and time * * *."

■ The basic and generally accepted rule is that a contractual restraint upon a promisor's freedom of action is unenforceable if the restraint is unreasonable and, of course, conversely, it is valid if the restraint is reasonable. Approaching the problem first from the negative side the Restatement of Contracts states that the restraint is unreasonable, if it

"(e) is based on a promise to refrain from competition *and is not ancillary* * * to an existing employment or contract of employment." (Sec. 515.) Our presently considered contracts do not conform to this part of the definition of unreasonableness. On the affirmative side, Section 516 states that the following bargain does not impose an unreasonable restraint:

"(f) A bargain by an assistant, servant or agent not to compete with his employer, or principal, during the term of his employment or agency, or thereafter, within such territory and during such time as may be reasonably necessary for the protection of the employer or principal, without imposing undue hardship on the employee or agent."

■ Considering only the precise wording of the latter section it leaves unclear the exact effect of failing to limit the restraint either in time or space. It does not state that, absent such limitation,

the restraint is unreasonable.[11] In this situation we advert to the general rule that the question of the reasonableness of a restraint is to be determined according to the facts of the particular case, Renwood Food Products v. Schaefer, 240 Mo.App. 939, 223 S.W.2d 144, and hence requires a thorough consideration of all surrounding circumstances including the subject-matter of the contract, the purpose to be served, the situation of the parties, the extent of the restraint and the specialization of the business and of the employment. Obviously such surrounding circumstances can be properly investigated only upon the production of evidence. Hence where the invalidity of the promisor's engagement is not apparent upon the face of it, it is nothing more than a truism to say that the reasonableness of a restrictive covenant cannot be determined by a mere inspection of a pleading. Such a determination requires the functioning of a trial court, acting upon the basis of the evidence produced before it. It follows that relators' raising here of the question of the validity of the restrictive covenant found in paragraph 4(b) is premature and accordingly furnishes no basis for a proceeding in prohibition.

The commitment of the relators not to engage in the same or a similar line of business upon the termination of their employment is found in paragraph 4(b) of their respective contracts. By paragraph 4(a) of each contract the respective employee agrees "To devote his entire time, skill, labor and attention, to said employment during the terms of this employment * * *." Plainly, by the latter paragraph the employee engages himself to work ex-

clusively for the plaintiff for the period of the contract. This paragraph is separable in its entirety from paragraph 4(b). We now note another section of the Restatement of Contracts, § 518, relating to restrictive covenants:

"Where a promise in reasonable restraint of trade in a bargain has added to it a promise in unreasonable restraint, the former promise is enforceable unless the entire agreement is part of a plan to obtain a monopoly; but if full performance of a promise indivisible in terms, would involve unreasonable restraint, the promise is illegal and is not enforceable even for so much of the performance as would be a reasonable restraint."

Clearly a contract for the exclusive services of an employee in a named occupation for a named period is not an unreasonable fettering of the employee's freedom of action. Paragraph 4(a) can stand by itself as a reasonable restriction upon relators and hence might well be enforceable even if paragraph 4(b) were found to be an unreasonable restraint, which, of course, we do not, by anything said herein, find to be the case. Whether or not it should be enforced by use of the injunctive process is a question which lies squarely within the power of the circuit court which could act intelligently only upon appropriate hearing and the development of the evidence as to the circumstances of the parties litigant. Accordingly we find that paragraph 4(a) by itself would afford an independent base—and possibly a sufficient base—for an injunction proceeding.[12] While equity will not decree specific performance of a

---

11. The comment to Restatement Section 515 states that "there is a territory between the two Sections [515 and 516] of greater or less extent which is not covered by the rules stated in either section." The comment continues, "Neither the period of time during which a restraint is to last, nor the extent of the territory that is to be included is conclusive but the length of time and even more the extent of space are important

factors in the determination of the reasonableness of a restrictive agreement."

12. Essex Specialty Co. v. Bueschel, 116 N.J.Eq. 337, 173 A. 595; Philadelphia Ball Club v. Lajoie, 202 Pa. 210, 51 A. 973, 58 L.R.A. 227; Savoy Record Co. v. Mercury Record Corp., D.C., 108 F. Supp. 957; Winnipeg Rugby Football Club v. Freeman, D.C., 140 F.Supp. 365.

personal service contract it has the power to enjoin the performance of such service for anyone else.[13]

■■■■ We have considered in detail the points made under the last three heads—irreparable damage, adequacy of legal remedy and restrictive covenant—because the parties have engaged in extended argument concerning each of them. However upon a thorough consideration of each it appears that the relators by applying for the writ of prohibition are endeavoring to have the injunction case tried in this court upon the merits, insofar as the three named points are concerned. Their contentions are addressed entirely to the merits of the plaintiff's case and not to the power of the circuit court to hear a case involving an alleged breach of contract. Plainly the merits can be determined only upon the holding of an appropriate hearing at which the parties can submit evidence in support of their respective contentions. By applying here for the writ, relators would circumvent the principle that prohibition cannot be used as a substitute for demurrer, appeal or error. State ex rel. Massman Const. Co. v. Buzard, 346 Mo. 1162, 145 S.W.2d 355; State ex rel. Hog Haven Farms, Inc. v. Pearcy, 328 Mo. 560, 41 S.W.2d 403; State ex rel. Connors v. Shelton, 238 Mo. 281, 142 S.W. 417; State ex rel. Supreme Temple, etc. v. Cook, 234 Mo.App., 898, 136 S.W.2d 142; State ex rel. St. Louis Cooperage Co. v. Green, 92 S.W.2d 930. If a defendant wishes to maintain that a petition does not state a cause of action, such an asserted defect is a matter addressed to the trial court by way of demurrer or the modern motion to dismiss, the overruling of which gives the losing party his right of appeal. It has been cogently stated that "Where it may be gleaned from the petition that the cause of action attempted to be stated belongs to that class of cases of which the circuit court has general jurisdiction, that court has jurisdiction to determine the sufficiency or insufficiency of the petition, and, if it should hold a bad petition good, or a good petition bad, such holding would be error which could be corrected by appeal or other appropriate remedy, but it furnishes no ground for prohibition." State ex rel. Leake v. Harris, 334 Mo. 713, 67 S.W.2d 981, 982.

Much earlier the Supreme Court had expressed itself to the same effect:

"* * * the question is one of jurisdiction, and not of pleading; for, if the court had jurisdiction over the subject-matter, it had the power to decide whether the pleadings were or were not properly drawn. * * * Given the jurisdiction, all else is a mere matter of error, to be corrected on appeal. * * * the mere failure of a petition to state a cause of action, * * * in no way affects the jurisdiction of the court." Schubach v. McDonald, 179 Mo. 163, 78 S.W. 1020, 1023, 65 L.R.A. 136; State ex rel. McNamee v. Stobie, 194 Mo. 14, 92 S.W. 191, 198.

■■■■ Confusion has been engendered in prohibition cases by the careless use of the term, Equity Jurisdiction, as if it were some kind of special jurisdiction separate and apart and distinct from the general jurisdiction of circuit courts. Equity Jurisdiction is a term which relates not to the power of a court to act but to the content of the alleged cause of action which the petition sets forth and the prayer for relief. Raising a question of "equity jurisdiction" simply states a problem of whether or not its allegations present the kind of case in

---

13. Savoy Record Co. v. Mercury Record Corp., supra.

"* * * wherever this court has not proper jurisdiction to enforce specific performance, it operates to bind men's consciences, as far as they can be bound, to a true and literal performance of their agreements; and it will not suffer them to depart from their contracts at their pleasure, leaving the party with whom they have contracted to the mere chance of any damages which a jury may give." Lumley v. Wagner, 1 DeG., M. & G. 604.

which a court should exercise its power to grant the kind of relief historically afforded by the separate courts of equity. Its references are not to the general authority of the court of general jurisdiction but to the substantive question of whether enough is shown to move the court to grant the peculiar remedies of equity, according to well established principles. If it be said that a showing of probable irreparable damage from breach of contract is a requisite to equitable relief that requirement is no different in essence from the requirement in an action at law that consideration for a promise must be shown in the action for damages for breach of the promise. In each case the stated requirement is an essential condition to the granting of a judgment because each goes to the merits of the case presented. But neither requirement goes to the authority of the court to act. Neither is a jurisdictional fact. For equity courts the matter was succinctly stated by Mr. Justice Stone in DiGiovanni v. Camden Fire Insurance Ass'n., 296 U.S. 64, 69, 56 S.Ct. 1, 3, 80 L.Ed. 47: "Whether a suitor is entitled to equitable relief in the federal courts, other jurisdictional requirements being satisfied, *is strictly not a question of jurisdiction* in the sense of the power of a federal court to act. *It is a question only of the merits;* whether the case is one for the peculiar type of relief which a court of equity is competent to give". (Our emphasis.)

It is clear that the objections to jurisdiction, stated by relators under the last three heads considered, all relate to the merits of plaintiff's case and do not properly challenge respondent's jurisdiction. "The decision of issues arising on the merits is peculiarly within the jurisdiction and power of the inferior court. It may decide the issues erroneously if it will. To say that the inferior court has jurisdiction to decide an issue and has no jurisdiction to decide it erroneously is a paradox." State ex rel. Henry v. Cracraft, 237 Mo.App. 194, 168 S.W.2d 953.

Relators' complaint that the petition for an injunction was made upon information and belief lacks substance. See § 526.040, V.A.M.S., and Supreme Court Rule 92.01; State ex rel Allai v. Thatch, Judge, 361 Mo. 190, 234 S.W.2d 1, 11. Neither do we find that respondent's power to act was neutralized by failure to conform to a practice rule of his own court. Section 526.140, V.A.M.S.; Supreme Court Rule 92.19; Wade v. Wade, Mo.App., 395 S.W.2d 515.

Writ of prohibition should be denied and preliminary rule quashed.

PER CURIAM.

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly writ of prohibition is denied and preliminary rule quashed.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.