H & R BLOCK EASTERN TAX SERVICES, INC. and H & R Block Tax Services, Inc., Plaintiffs,

v.

Richard ENCHURA, Perbie Fortner, and Jackson Hewitt, Inc., Defendants.

No. 00–1045–CV–W–3–ECF.

United States District Court, W.D. Missouri, Western Division.

Nov. 2, 2000.

## PRELIMINARY INJUNCTION

SMITH, District Judge.

Plaintiffs brought this suit seeking, *inter alia*, a temporary restraining order and preliminary injunction (1) barring individual defendants Richard Enchura and Perbie Fortner from commencing work for co-defendant Jackson Hewitt, Inc. ("JH"), violating restrictive covenants contained in their written employment contracts, and otherwise divulging confidential trade secrets, and (2) barring JH from allowing Enchura and Fortner to commence working for it. A TRO granting this relief was issued on October 19, 2000. On October 30, the Court received evidence and argument regarding Plaintiffs' request for a preliminary injunction. Plaintiffs' request for a preliminary injunction is granted in part.

### I. BACKGROUND

Plaintiffs provide financial services to the public, and are the leaders in the business of preparing income tax returns. JH is Plaintiffs' leading competitor in this segment of the financial services field. Plaintiffs operates out of approximately nine thousand individual offices, approximately five thousand of which are company-owned (with the rest being franchises), whereas JH exclusively utilizes franchises. Plaintiffs provide support for its franchises pri-

marily in the form of advice and information in a wide variety of areas including pricing, personnel, and other areas of business operation. Plaintiffs' franchises may call upon Plaintiffs to provide expertise in these (and other) areas, but they are not required to do so, nor are they required to take any actions that are suggested to them. JH provides similar support for its franchises; although it controls such matters as location and advertising, in most areas it only provides suggestions (such as in pricing) or makes services or products available (such as software and furnishings). Plaintiffs offer a variety of financial services, ranging from tax preparation to mortgages, whereas JH only offers tax preparation services. JH targets a narrower range of customer than the Plaintiffs.

As the leader in this industry, Plaintiffs' innovations are regularly emulated by its competitors, including JH. It is acknowledged by all concerned that once Plaintiffs' new products/services are revealed to the public, competitors will also be aware of them and may begin developing their own versions for the following tax season.

Plaintiffs have designated nineteen geographic regions for its company-owned locations and four geographic regions for franchises. Regions are comprised of seventeen to twenty-five districts, each containing ten to twenty individual tax preparation offices. In 1988 Enchura was promoted to Regional Director for Region 17, which consists of large portions of New Jersey and parts of New York (including New York City). In 1992 Fortner was promoted to Regional Director for Region 21, which is based in Atlanta and encompasses Georgia, large portions of Alabama and parts of South Carolina. Both regions are comprised exclusively of company-owned locations; neither Enchura nor Fortner had any recent involvement with franchises. Their duties gen-

erally consisted of establishing financial and other goals for the company-owned offices within the region, recruiting, training and supervising district managers, and budgeting. Other than maintaining positive relationships with businesses in the region, Enchura and Fortner had no responsibility for marketing; all marketing is done as part of a national campaign and there is no indication that regional managers are responsible for developing and executing advertising or other marketing campaigns. They have extensive experience in the field and are considered extremely capable in their profession.

Both men signed written employment contracts; Enchura's latest contract is dated May 1, 1998 and Fortner's latest contract is dated September 1, 1997. Both agreements are the same in all respects relevant to this lawsuit. The agreements establish a term of employment commencing on May 31 of each year and terminating one year later, at which time the agreement would automatically renew for another year unless either Plaintiffs or the employee provided written notice to the contrary within fifteen days prior to May 31. The agreements contained several provisions that applied specifically in the event a regional director left Plaintiffs' employ, only two of which are implicated in the present suit.[1] The first, appearing in paragraph eight, addresses confidential information and states in part as follows:

> In the event Regional Director leaves the employment of the Company, Regional Director would have available knowledge and information the use of which could substantially injure the company in its present operations and planned expansion. Therefore, during the continuance of this Agreement, and for a period of two years thereafter ... Regional Director shall not, without the Company's prior written authorization, directly or indirectly, make known, di-

---

**1.** Paragraph ten limits a Regional Director's ability to solicit Plaintiffs' customers; there has been no suggestion that this restriction has been violated, and Plaintiffs have not invoked paragraph ten in their efforts to obtain relief.

vulge or communicate to any person or entity any confidential business information of the Company, . . . .

Paragraph nine contains a covenant against competition, and declares as follows:

> During the continuance of this Agreement and for a period of two years thereafter ... Regional Director shall not, directly or indirectly (whether as owner, employee, agent, partner, stockholder or in any other capacity), solicit, accept or in any way establish or engage in any business for the preparation or electronic filing of tax returns situated within (or soliciting business within) the Region assigned to Regional Director under this Agreement or any other H & R Block Region in which Regional Director has been employed as Regional Director or otherwise, within the two year period immediately preceding the termination of this agreement.

As should be obvious, the most critical time for the tax preparation industry is approximately January 1 to April 15.[2] Planning for the upcoming season starts in the summer and fall of the preceding year.[3] Plans are announced in an annual Tax Operations National Meeting, which customarily takes place each September and last took place September 18–22, 2000 (the "September Meeting"). Historically, the September meeting is regarded as preliminary in nature, with final plans being announced at a similar meeting held the ensuing November; this year, however, there have been indications that there will not be a November meeting.

Neither Plaintiffs, Enchura, nor Fortner provided the written notice contemplated by the agreement. Both Enchura and Fortner attended the September Meeting and received written copies of the information distributed at the September Meeting. The information was distributed in a large, three-ring notebook containing a stack of papers nearly three-inches high. Some of the information is publicly available or is not the subject of Plaintiffs' efforts to limit availability. However, some of the information can be described generally as "trade secrets" (a legal analysis of this term will appear below), including information about client profiles, advertising campaigns, promotional plans, new services, financial data and projections and compensation and pricing plans. Much (but not all) of this information will be publicly available in early January 2001, when Plaintiffs advertising campaigns start and the tax preparation season begins in earnest. Most of the sensitive information (e.g., pricing, compensation, survey results, other numerical data) is contained in detailed charts and graphs that defy easy memorization. Although the information is useful, the contents are too voluminous to commit to memory. This is not to say that Enchura and Fortner learned nothing during the meeting. For instance, Enchura is well-versed on the financial performance of his region and can recall this type of information and knows generally how his region performed in comparison to other regions; however, he does not possess specific information relating to Plaintiffs' other regions.

Breakout sessions were held during the September Meeting. Some of those sessions dealt specifically with franchises as opposed to company-owned locations. Neither Enchura nor Fortner attended these sessions. However, some if not most of the information they obtained relates equally well to both franchises and company-owned locations.

---

**2.** "Since the focus of [Plaintiffs'] business is on preparation of tax returns, approximately 90 percent of revenue and 100 percent of profit is generated between January 1 and April 15 of each year." Amended Complaint, ¶ 20.

**3.** This is part of the reason that the Regional Director Agreement operates in one-year renewable terms: it provides Plaintiffs with some assurance as to who among the prior year's Regional Directors will be "returning" and can therefore be told of plans for the upcoming year.

Within a week of the September Meeting, Fortner announced that he was leaving to take a job with JH. In early October, Enchura also left to take a position with JH. Both men had grown disenchanted with their employment for Plaintiffs; in fact, Enchura had been exploring other opportunities for at least a year. Both men were contacted by JH in late August. Fortner revealed this fact to his boss, Mark Whitaker, on September 13. In doing so, Fortner did not disguise his interest in JH. Fortner accepted JH's offer on September 25 and relayed this fact to Whitaker two days later. Enchura received his offer on September 26; although he had not decided whether to accept, he communicated the fact of JH's offer to Whitaker the next day.

Fortner's position with JH is Senior Vice President of Franchise Operations. He is responsible for services (e.g., "tax school," training, supplies, and other support), accounting standards, and operation standards. He explained that responsibility for accounting standards encompasses the setting of goals and ascertaining that JH receives the royalties it is due. Operation standards entails insuring that franchises comply with their franchise agreements. Fortner is also responsible for the growth of franchises, both in terms of their number and the amount of each franchise's business. Fortner's responsibilities do not include marketing, advertising, or development of new products and services. In terms of geography, Fortner's responsibility covers franchises throughout the United States, including locations lying within his former region.

Enchura's new position is Senior Vice President with asset management responsibility for Tax Services of America ("TSA"), in which JH holds an equity position. TSA was formed in September 1999. It is JH's largest franchisee and includes franchises acquired in recent acquisitions. TSA's franchises are located primarily west of the Mississippi; there are some franchises in the eastern part of the country but none are in Plaintiffs' Region 17. Enchura's immediate responsibility is to integrate TSA into the JH system, and he will be focusing on areas such as tax preparation software, staffing sufficiency, payroll, site selection, and supplies. He will be responsible for lending advice and expertise to TSA in these and other areas on a continuing basis.

Enchura and Fortner have returned all documents given to them by Plaintiff, including the materials disseminated at the September meeting and any notes that they made. There is insinuation, but no evidence, that Enchura and/or Fortner made and retained copies of the information distributed at the September Meeting. The Court finds no basis for concluding they have retained copies of these materials.

## II. DISCUSSION

### A. Standard

■ "Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (en banc).

### B. Covenant Not to Compete

■ A covenant not to compete can be enforced through injunctive relief. *E.g., Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 75 (Mo.1985) (en banc). "Covenants against competition must serve a proper interest of the employer in protecting the good will of a business, and must be reasonably limited in time and space." *Id.* Defendants have indicted that they do not object to an injunction to enforce the covenant but have also indicated that it is not necessary because neither Fortner nor Enchura is violating the covenant. The

Court will issue an injunction because (1) Defendants concede that an injunction is appropriate and (2) contrary to Defendant's argument, Fortner is violating the covenant.

Fortner has responsibilities relating to franchises that are operating in his former region. Those franchises are engaged in the business of preparing and/or electronically filing tax returns of taxpayers in that region. Thus, Fortner is at least indirectly involved in the business of preparing and/or electronically filing tax returns in his former region. The fact that he now deals with franchises whereas his last job for Plaintiffs did not is irrelevant; this distinction is not described in paragraph nine of the employment agreement and has no bearing on whether or not Fortner is engaging in business in the region. Similarly, the fact that he does not supervise the franchises is irrelevant; the covenant is not limited to prohibiting direct supervision of businesses, and the use of the phrase "indirectly . . . engage in any business" appears sufficiently broad to encompass Fortner's current job duties. The Court thus concludes that Plaintiffs are likely to succeed on their claim that Fortner is violating the restrictive covenant contained in his agreement, and further concludes that Plaintiffs are likely to suffer irreparable harm if injunctive relief is not granted. The potential harm to Plaintiff is greater than the potential harm to Fortner, given that Fortner still has a wide variety of duties that he can perform.

Fortner cannot have any involvement with or responsibility for franchises located in his former region, even if his involvement/responsibility is limited to an advisory or supportive role. This does not preclude Fortner from assuming such responsibilities for franchises in other regions, because doing so is beyond the geo-graphic scope of his covenant. This curtails Fortner's ability to set nationwide policies for JH's franchises, because doing so still constitutes involvement with franchises in his region. Essentially, a "Chinese wall" must be erected to separate Fortner from all involvement with the franchises in his former region.[4]

■ However, Enchura does not appear to be violating the covenant because he is neither directly nor indirectly engaged in the business of preparing or electronically filing tax returns in his former region. The franchises with which he works are located in other geographic regions. Plaintiffs suggest that he is violating the covenant simply because JH's offices are in New Jersey and New Jersey was in Enchura's region. However, the business of tax preparation and electronic filing with which Enchura is connected is not occurring in New Jersey, and he has no involvement with franchises who are conducting such business in his former region. Therefore, Enchura is not directly or indirectly engaged in the business of tax preparation or electronic filing in New Jersey. So long as TSA does not add any franchises in Enchura's former region, Enchura can continue his planned duties without violating paragraph nine of the agreement.

## C. Trade Secrets

■ Under the Missouri Uniform Trade Secrets Act, a "trade secret" is information or data that

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

4. The Court realizes that this will create hardships for JH (particularly with regard to any effort to implement or devise uniform national strategies), but those hardships are outweighed by the risk of harm to Plaintiffs. Moreover, the Court notes that JH was fully aware of the limitations imposed by the covenant when it hired Fortner, and that JH seems to have adopted Fortner's rather restricted reading of that provision. JH and Fortner should bear the risk and consequence of a violation of the covenant.

(b) Is the subject of efforts that are reasonably under the circumstances to maintain its secrecy.

Mo.Rev.Stat. § 417.453(4). Actual or threatened misappropriations of trade secrets may be enjoined. *Id.* § 417.455.1. "Misappropriation" is statutorily defined and occurs in two ways. The first is when one acquires a trade secret through "improper means," that is, through such means as theft, bribery or inducing one to breach a duty of secrecy. *Id.* § 417.453(2)(a) (incorporating phrase "improper means", which is defined in § 417.452(1)). There is no evidence that this occurred in the present case. The second example of misappropriation occurs when one disclosing a trade secret without consent, *inter alia,* knew or had reason to know that the secret was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Id.* § 417.453(2)(b).c(ii).

██ The Court concludes that Plaintiffs have been somewhat broad in their designation of materials as trade secrets. Some of the information so designated is publicly available, and some of it is so elementary and obvious (e.g., certain basic, business-oriented catch phrases and Plaintiffs' desire to retain experienced tax preparers) that there is no competitive advantage gained from its secrecy. However, Fortner and Enchura were exposed to some of Plaintiffs' trade secrets at the September Meeting. These consist primarily (but not exclusively) of (1) details of advertising and marketing plans, (2) changes and additions to services offered to customers, and (3) compensation and pricing issues.

There has been no evidence that the individual Defendants have actually misappropriated those trade secrets by revealing them to JH (or anyone else). The present focus is whether there is a threatened misappropriation. The Court concludes there is not.

██ Plaintiffs' sole argument is that disclosure is inevitable. In making this claim, they do not argue that Enchura or Fortner will purposely and consciously reveal Plaintiffs' trade secrets to JH.[5] Instead, relying on the Seventh Circuit's decision in *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995), Plaintiffs argue that Fortner and Enchura will inevitably, albeit subconsciously, rely on and use Plaintiffs' trade secrets while performing their duties for JH. In relying on *PepsiCo,* Plaintiff ignores that case's unique facts as well as the Seventh Circuit's indication that the theory employed therein will arise rarely. 54 F.3d at 1270.

*PepsiCo* involved the General Manager (Redmond) of PepsiCo's North American California Unit, which was responsible for a significant percentage of PepsiCo's North American profits. This high-ranking position gave Redmond access to inside information about PepsiCo, including specifically its strategies for manufacturing, producing, marketing, packaging and distributing products. Of critical importance was PepsiCo's plans regarding sports drinks and "new age" drinks (collectively "sports drinks"), which Redmond bore significant responsibility for implementing. In November 1994, Redmond accepted an offer from Quaker Oats Company ("Quaker"), which directly competed with PepsiCo in the sports drink market. The district court found (and the appellate court affirmed the finding) that Redmond deceived PepsiCo by revealing the fact of the offer but misstating that he had not decided what to do when he had already accepted it. Redmond's duties at Quaker include planning the pricing, distribution systems, products, packaging and marketing for Quaker's sports drink products. The district court granted PepsiCo's request for an injunction that, *inter alia,* prohibited

---

**5.** The Court credits Enchura's and Fortner's testimony that they will not reveal trade secrets.

Redmond from assuming any duties for Quaker.

The Seventh Circuit characterized PepsiCo's argument as an "assert[ion] that Redmond cannot help but rely on [PepsiCo's] trade secrets as he helps plot Gatorade and Snapple's new course, and that these secrets will enable Quaker to achieve a substantial advantage by knowing exactly how [PepsiCo] will price, distribute and market its sports drinks and new age drinks and being able to respond strategically." 54 F.3d at 1270. Redmond and Quaker argued that Quaker and PepsiCo had different distribution systems and plans, and that Redmond had promised not to disclose any confidential information. These arguments were rejected as "fall[ing] somewhat short of the mark" because Redmond would likely be in situations in which his knowledge of PepsiCo's plans would be helpful to him in charting Quaker's actions. *Id.* The Seventh Circuit ultimately concluded as follows:

> Thus, when we couple the demonstrated inevitability that Redmond would rely on [PepsiCo] trade secrets in his new job at Quaker with the district court's reluctance to believe that Redmond would refrain from disclosing these secrets in his new position (or that Quaker would ensure Redmond did not disclose them), we conclude that the district court correctly decided that PepsiCo demonstrated a likelihood of success on its statutory claim of trade secret misappropriation.

*Id.* at 1271.

This suggests that demonstrated inevitability alone is insufficient to justify injunctive relief; rather, demonstrated inevitability *in combination with* a finding that there is unwillingness to preserve confidentiality is required. The Court finds no evidence to support the latter finding, making *PepsiCo* inapposite.

Even if demonstrated inevitability of disclosure is enough to justify injunctive relief, Plaintiffs still do not prevail because they have not proved it exists. In *PepsiCo*, inevitability was proved because Redmond's responsibilities at Quaker involved making the very same decisions he made at PepsiCo with respect to sports drinks, and responding to PepsiCo's plans which (1) he helped create, (2) he was previously responsible for implementing, and (3) constituted trade secrets. Plaintiffs have demonstrated that Enchura and Fortner possess expertise, based on their prior experience, that will make them very proficient in their new positions. This showing is inadequate; what is necessary is some indication that Enchura and Fortner will be making decisions for JH in the same areas covered by Plaintiffs' trade secrets *and* that Enchura and Fortner have been so involved with Plaintiffs' trade secrets that they cannot help but consider them while performing duties for JH. Although Enchura and Fortner were exposed to Plaintiffs' trade secrets, they were not involved in their creation (as was Redmond). Further, many of the secrets are not so easily memorized that it can be assumed that Enchura or Fortner will be able to subconsciously rely on the information. The information that is subject to recall (e.g., general information about certain of Plaintiffs' advertising and product plans) are so unrelated to Enchura's and Fortner's present duties that there is no risk that Enchura or Fortner can utilize that information on JH's behalf. The matter might be different if, for instance, either person was involved in the development of new products for JH. In such a case, it might be reasonable to conclude that someone armed with knowledge of Plaintiffs' plans could not help but consider those plans in developing new plans for JH. This is not the case at hand.[6] Plaintiffs have shown that Enchura's and Fortner's considerable expertise will be very

---

**6.** The Court also finds that Plaintiffs' plans for the upcoming tax season will be public in a few months, and even if JH started preparing

now there is insufficient time for it to develop its own version of those services.

helpful to them in performing their new duties, but this expertise does not constitute a trade secret, nor does it demonstrate that they will inevitably rely upon Plaintiffs' trade secrets.

■ The flaw in Plaintiffs' argument is their unspoken assumption that exposure to trade secrets creates an inference of inevitable disclosure. If this were all the proof that were necessary, Plaintiffs (and other employers) could achieve greater restrictions on former employees than they could contract for explicitly. To prevail under this theory, employers must demonstrate inevitability exists with facts indicating that the nature of the secrets at issue and the nature of the employee's past and future work justify an inference that the employee cannot help but consider secret information. Plaintiffs have not made that showing in this case.

### D. Breach of Contract

■ Plaintiffs finally argue that they are entitled to injunctive relief because Fortner and Enchura did not honor their agreements to remain employed until May 31, 2001. The difficulty is in determining that there is a threat of irreparable harm arising from the violation of this provision. Plaintiffs argue that they are harmed because their anticipated management team will not be intact, but this harm will be prevented only if the Court orders Fortner and Enchura to return to their former positions—relief that Plaintiffs do not seek and the Court cannot grant. Barring Fortner and Enchura from working for JH will not recreate the management team Plaintiffs thought they had for the upcoming tax season. To the extent that the irreparable harm stems from Fortner's and Enchura's employment with a competitor (an argument not specifically relied upon by Plaintiffs under this ratio-

nale for the injunction), Plaintiffs cannot obtain greater relief than was specifically contemplated by their agreement.

With that latter point in mind, the Court notes that Plaintiff's legal authorities are inapplicable. For instance, in *State ex rel. Schoenbacher v. Kelly*, 408 S.W.2d 383 (Mo.App.1966) (the only Missouri authority Plaintiff relied upon for this point) [7], the employees' written contracts contained a four-year term and separately prohibited them from competing, presumably forever, in the St. Louis area. Without commenting on whether this latter limitation was of unreasonable duration and hence unenforceable, the court suggested the contract's duration might supply a reasonable limitation, given that "a contract for the exclusive services of an employee in a named occupation for a named period is not an unreasonable fettering of the employee's freedom of action." 408 S.W.2d at 394. The Court went on to declare that the mere existence of the restriction did not automatically justify resort to injunctive relief, saying that "[w]hether or not it should be enforced by use of the injunctive process is a question which lies squarely within the power of the circuit court which could act intelligently only upon appropriate hearing and the development of the evidence as to the circumstances of the parties litigant." *Id.* Thus, the mere existence of an employment term does not automatically entitle the employer to an injunction. In *Kelly*, the potential loss of customers served as a potential irreparable harm supporting the injunction. In this case, as stated earlier, Plaintiffs only argument for irreparable harm cannot be cured with an injunction. Other possible harms include loss of customers and loss of trade secrets. The risk of direct competition for customers is the subject of a specific clause in the employment contract (which has not been invoked), and Plain-

---

**7.** The other cases upon which Plaintiff relies are inapposite because those cases relied upon explicit language appearing in the contracts of professional athletes that limited the athletes' ability to play for other teams.

Moreover, the Court believes that cases involving professional athletes are *sui generis* and have little application in a case such as this.

tiffs cannot obtain greater restrictions on employment than they specifically bargained for. As held earlier, Plaintiff's trade secrets are not at risk, so this cannot justify an injunction. Finally, the Court doubts that the *Kelly* court would have allowed the duration of the employment term to serve as a *de facto* worldwide geographic limitation. In other words, had the employees attempted to ply their trade outside the geographic region specified in the contract, an injunction would not have been appropriate because it (1) was greater than that specifically bargained for by the parties and (2) would have been unreasonable in geographic scope.

## III. CONCLUSION

Consistent with the above discussion, Plaintiffs' request for a preliminary injunction is granted as follows.

1. Enchura and Fortner are enjoined from advising, supervising or being involved with, directly or indirectly any of JH's franchises in the regions in which they previously worked while employed by Plaintiffs. In light of JH's and Fortner's previous narrow construction of the restrictive covenants in Fortner's contract, the Court intends a broader reach than they may have previously contemplated. For instance, Fortner and Enchura may have *no* involvement with franchises in their former regions, whether it be direct supervision, establishing policies or even *making suggestions* that will be communicated to such franchises.

2. JH is enjoined from permitting Enchura and Fortner to advise, supervise or otherwise be involved with franchises located in their former regions.

3. Enchura and Fortner are enjoined from revealing any of Plaintiffs' trade secrets, including particularly information about plans related to

advertising, marketing, and new products and services.

4. The injunction bond of $30,000.00 posted previously by Plaintiffs in conjunction with the temporary restraining order shall be continued.

IT IS SO ORDERED.